**CHEVRON U.S.A., INC.**

v.

**Robert W. SALSMAN, Jr. and Lottie Bomer Smith McGill, Executrix of the Succession of Lottie B. Smith.**

**Civ. A. No. 81–540–B.**

United States District Court,
M.D. Louisiana.

March 15, 1984.

John C. Christian, M. Taylor Darden, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff.

Andrew J.S. Jumonville, Lafayette, La., David M. Ellison, Jr., Ellison & Smith, Ralph E. Hood, Baton Rouge, La., for defendants.

## OPINION

POLOZOLA, District Judge.

Chevron U.S.A., Inc. (Chevron) has filed this suit seeking a declaratory judgment on the validity of a mineral lease. Named as defendants herein are Robert W. Salsman, Jr. and the executrix of the succession of Lottie B. Smith. Chevron seeks to declare null and void a mineral lease dated July 3, 1978, granted by Lottie B. Smith to Robert W. Salsman, Jr. Chevron contends that the lease of July 3, 1978 operates as a cloud upon Chevron's pre-existing leasehold rights under an oil, gas and mineral lease which it acquired from Lottie B. Smith and two of her children, Arthur Neil Smith, Jr. and Ethel Cherry Smith McCraine, on January 2, 1976, which affects the same property. Lottie Bomer Smith McGill, the executrix of the succession of Lottie B. Smith, has admitted all of the factual allegations contained in Chevron's complaint and has prayed for judgment in Chevron's favor. Robert W. Salsman, Jr. denies that his lease in any way infringes upon the leasehold rights of Chevron. Salsman contends that Lottie B. Smith owned an undivided seventy-five percent interest in the property in question but that the Chevron lease only covered a fifty percent interest in the property. Thus, Salsman alleges that the Salsman lease only covers the unleased portion of Lottie B. Smith's interest in the property in question.

For reasons which follow, the court finds that the July 3, 1978 lease is null and void.

## I. FINDINGS OF FACT

Chevron entered into an oil, gas and mineral lease on January 2, 1976, with Lottie B. Smith, Arthur Neil Smith, Jr. and Ethel Cherry Smith McCraine.[1]

---

1. The lease, which was properly recorded, purports to cover the following described property located in Pointe Coupee Parish, Louisiana:

    TRACT I: That certain tract of land being all of Section 78, Township 4 South, Range 8 East, Louisiana Meridian; and being bounded, now or formerly, as follows: North by Kette & Boyd C. Yearwood and Geo. Gilmer Lacour et al; East by N.W. Claiborne; South by Rex E. Callicut; and West by Pointe Coupee Land & Implement Company and Tract II herein; said tract containing 638.88 acres, more or less.

    TRACT II: That certain tract of land located in Fractional Section 79, Township 4 South, Range 8 East, Louisiana Meridian; and being bounded, now or formerly, as follows: North by Pointe Coupee Land & Implement Company; East by Tract I herein; South by Rex E. Callicutt; and West by Sidney B. Guedry et al

The granting clause of the lease does not set forth what interest was owned by each lessor in the property and fails to specify a percentage of interest in the mineral rights owned by the lessors which was to be covered by the lease. Instead, the lease gives Chevron the "exclusive right" to use all of the described acreage for the exploration for and production of minerals.

Lottie B. Smith owned an undivided seventy-five percent interest in the property. The rental division order clause in the lease required that Chevron pay to Lottie B. Smith's designated depository only fifty percent of the rentals due under the lease. Following the division order clause, the lease provides:

> Each of the undersigned parties agrees that payment or tenders of said rentals as set forth above will protect said lease and continue same in force as therein provided insofar as said lease covers the interest of such undersigned party in said land. Each undersigned party, however, certifies only the interest, if any, set forth above opposite such party's name.

On July 3, 1978, Lottie B. Smith executed a purported mineral lease in favor of Robert W. Salsman, Jr. on the property in question.[2]

On July 3, 1978, Salsman wrote a counter letter to Lottie B. Smith. This counter letter was accepted by Lottie B. Smith on July 17, 1978. The purpose of the counter letter was to express "certain correlary (sic) and collateral agreements" which were not to be expressed in the lease but which would control the interpretation of the agreement between the parties. The July 3, 1978 counter letter also provided:[3]

> "1. There shall be no initial cash payment made by Lessee. The considerations for the lease and this counter letter are the efforts and expenses undertaken and to be undertaken by Lessee in establishing the unleased nature of Lessor's mineral interest covered and affected thereby, and in securing the best possible trade for the lease.
>
> 2. Lessee is in fact acting as Lessor's agent and all his actions shall be to the sole benefit of his principal.
>
> 3. As agent, Lessee will be paid 10% of Lessor's interest in the lease and/or the sale thereof, and all sums of money received in connection therewith.
>
> 4. Lessor shall bear the burden of that Letter Agreement dated June 30, 1978 by and between Robert W. Salsman, Jr. and Andrew J.S. Jumonville with regards to the terms of employment concerning anticipated legal problems affecting Robert W. Salsman, Jr.'s leasehold rights. Said Letter Agreement being attached hereto and made a part hereof as Exhibit 'B'."

On July 14, 1978, Salsman wrote a letter to Ethel Cherry Smith McCraine, Arthur Neil Smith, Jr. and Edwin Bomer Smith, II, wherein he claimed that he was the owner of the July 3, 1978 lease. However, in this letter, Salsman stated:[4]

> In truth and in fact I am acting as Mrs. Smith's agent and as such I will attempt to make the best possible trade for the

---

and Pointe Coupee Land & Implement Company; said tract containing 285.12 acres, more or less.

**2.** The July 3, 1978 lease contained the following paragraph which followed the property description:

> It is the intention of Lessor to lease herein all of her undivided right, title and interest in and to the above described property, which unleased undivided interest is belived (sic) to be one-third (⅓) of an undivided three-fourths (¾) interest, or a net one-fourth (¼)

interest; however, this Lease shall cover all of the Lessor's unleased interest in and to the leased premises whether same be more or less than an undivided one-fourth (¼), and it is expressly provided that the bonus paid by Lessee to Lessor for this Lease is sufficient consideration for all of Lessor's unleased interest, as same may appear.

**3.** Chevron Exhibit 5; Salsman Exhibit 3

**4.** Chevron Exhibit 7; Salsman Exhibit 5

Salsman lease as stated in that Letter Agreement dated July 3, 1978 by and between Mrs. Smith and myself. As also stated in the Agreement I will receive 10% commission for my efforts.

On October 15, 1978, Lottie B. Smith, Arthur Neil Smith, Jr. and Ethel Cherry Smith McCraine executed an agreement[5] with Chevron wherein they amended the January 2, 1976 lease to change the depository bank listed in the division order clause and also added the following paragraph to replace that contained in the division order clause:

> "14. As an alternate method and manner of tendering or paying delay rentals under Paragraph 1 of said lease, each Lessor individually and all Lessors jointly hereby advise, authorize and direct Lessee that it may pay or tender the said delay rentals to Lessors or to the credit of Lessors in the depository bank or banks named below, in the amounts stated below even though such amounts may not reflect the proportionate interests of Lessor: * * * "

In addition, the lessors ratified and confirmed the 1976 lease and also agreed to "grant, lease and let all the land described in said lease unto Lessee herein, its successors and assigns upon the terms and provisions of said lease herein amended."[6] On September 3, 1980, the parties again amended and ratified the lease and included the clause granted in the preceding sentence.[7]

Lottie B. Smith died on March 3, 1981. Subsequently, Chevron obtained ratifications of its original lease from the heirs of Lottie B. Smith.[8] Each of the heirs of Lottie B. Smith executed a ratification confirming and adopting the lease as covering the entire interest in the property owned by Lottie B. Smith and now inherited or to be inherited by the Smith heirs. Each ratification granted, leased and let to Chevron the entire interest of the ratifier in the property in question.

## II. THE COURT'S JURISDICTION

Salsman contends the court does not have jurisdiction under 28 U.S.C. § 1332 because there is no diversity between the parties in this case. Salsman contends that the parties should be realigned according to their true interests in the case. Thus, Salsman contends that the executrix of the succession of Lottie B. Smith should be realigned as a plaintiff because she has prayed for judgment on behalf of Chevron. Salsman argues that if the executrix was realigned as a plaintiff, the court would be without the requisite diversity which is necessary for the court to have jurisdiction under 28 U.S.C. § 1332.[9] Salsman's argument is without merit. *Bianca v. Parke-Davis Pharmaceutical Div.*, 723 F.2d 392 (5th Cir.1984).

It is clear that the realignment of the parties per se in this case would not destroy diversity. Chevron is a California corporation with its principal place of business in California. Salsman is a citizen of Louisiana and Lottie Bomer Smith McGill is a citizen of Florida. Thus, even if McGill is realigned as a plaintiff in this case, such a

---

5. Chevron Exhibit 2

6. See footnote 5

7. Chevron Exhibit 3

8. The ratifications were executed by the following heirs on the following dates:
   a) Arthur Neil Smith, Jr., July 6, 1981 (Chevron Ex. 8)
   b) Ethel Cherry Smith McCraine, July 20, 1981 (Chevron Ex. 9)
   c) Edwin Bomer Smith, II, August 12, 1981 (Chevron Ex. 10)
   d) Mary McGill McKay, August 7, 1981 (Chevron Ex. 11)
   e) Lottie Smith McGill, July 31, 1981 (Chevron Ex. 12)
   f) Robert E. McGill, III, August 5, 1981 (Chevron Ex. 13)
   g) Thomas Bomer McGill, July 31, 1981 (Chevron Ex. 14)
   h) Gordon Richie McGill, July 31, 1981 (Chevron Ex. 15)

9. 28 U.S.C. § 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

realignment would not affect per se the diversity jurisdiction of this court since the parties are from different states.

However, Salsman argues that the citizenship of the executrix of the succession should be the same as that of the decedent or heirs of the succession. In those instances where the citizenship of the administrator or executor of the estate is disregarded, there was an attempt to collusively gain the jurisdiction of the court. Such activity is specifically prohibited by 28 U.S.C. § 1359. Thus, the court must make an inquiry into the reasons and purpose for the appointment of an out of state administrator to determine whether the appointment was motivated by an intent to manufacture diversity jurisdiction.[10]

In *Bianca*, the court set forth the following guidelines for the court to follow in making this determination:[11]

> In sum, we have for many years adhered to the rule that an administrator whose appointment is not motivated by an intent to manufacture diversity does not fall within the proscription of § 1359, and that the existence of diversity will accordingly be determined with reference to his citizenship. Whether the administrator has a substantial stake in the litigation, whether he has duties above and beyond prosecution of the lawsuit, and whether the estate contains assets other than the wrongful death claim may all inform our judgment as to the motive for the appointment, but none of these elements are independently necessary to sustain jurisdiction if no improper motive underlies the appointment.
>
> *Id.*, at 397.

■ It is clear to the court that the executrix of the succession was not collusively joined in this case. Mrs. McGill was named as the executrix of the succession of her mother prior to her mother's death. There is no evidence that Mrs. McGill's residence was a factor in this decision. There is also no evidence that she was named "with a purpose to manufacture diversity."[12] She has duties in addition to those involved in this case. It is also clear that the executrix has a personal interest in the litigation. She is the daughter of the deceased and an heir to the estate. Under these circumstances, it is difficult for the court to believe and there is no evidence to suggest that Mrs. McGill has been collusively joined for the purpose of creating diversity jurisdiction in this court.[13]

Thus, the court finds that there is complete diversity between the parties in this case irrespective of whether Mrs. McGill remains a defendant or is realigned as a plaintiff.

Salsman also questions the court's jurisdiction on the grounds that there is no actual case or controversy between the parties in this case as required by Article III of the Constitution. He argues that Chevron's lease only covered fifty percent of Lottie B. Smith's interest in the property in

---

**10.** In *Bianca v. Parke-Davis Pharmaceutical Div.*, supra, the Fifth Circuit discussed in detail the "substantial stake" test and the "proper motive" test. After an exhaustive analysis of the jurisprudence the Fifth Circuit declared that the "proper motive" test would be followed in the Fifth Circuit.

The court concluded:
■ We conclude that the "substantial stake" test cannot be justified under the language of § 1359. The statutory interdict against jurisdiction where a party "has been improperly or collusively made or joined to *invoke* the jurisdiction" of the federal courts (emphasis added) incontrovertably suggests to us that the motive underlying the naming of the administrator must guide the diversity inquiry. If an out-of-state administrator has not been selected with the purpose of manufacturing diversity, the administrator's lack of a stake in the outcome of the litigation cannot alone trigger § 1959's jurisdictional bar.
723 F.2d at 398.

**11.** See, also: *Green v. Hale*, 433 F.2d 324 (5th Cir.1970); *Lummis v. White*, 629 F.2d 397 (5th Cir.1980), rev. on other grounds; *Cory v. White*, 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982).

**12.** *Id.*, at 398.

**13.** In footnote 7 of the *Bianca* opinion, the Fifth Circuit suggested that if the administratrix had a stake in the litigation, it could see "some virtue in a per se rule favoring jurisdiction under such circumstances".

question and that his lease covered her other twenty-five percent interest. Salsman argues that his lease does not affect, infringe, or in any way cloud Chevron's pre-existing leasehold interest in Mrs. Smith's property. Therefore, Salsman contends that there is no actual dispute between Chevron and himself. If there is no actual case or controversy before the court, the jurisdictional requirements of Article III are not met and the court is without authority to decide the case.[14]

An actual case or controversy is presented when the court is faced with a controversy that is "definite and concrete, touching the legal relations of parties having adverse legal interests. * * * Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages." *Aetna Life Insurance Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 88 L.Ed. 617 (1937). The court must find that under the facts alleged there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

In this case the court finds that the requirements for a case or controversy within the meaning of the Constitution and the Declaratory Judgment Act are met.

The leases under which both parties claim their interest in the mineral rights cover the same property. The Chevron lease, according to Chevron, covers all of Lottie B. Smith's interest in the property. The Salsman lease, according to Salsman, covers at least one-quarter of the same interest that Chevron claims. Salsman maintains that until Chevron proves that its lease covers all of Lottie B. Smith's interest in the property, there is no controversy between these parties. Obviously this contention is erroneous because if Chevron did prove that its lease covered all of Mrs. Smith's interest, then Salsman's lease would be null and void. Chevron need only allege that there are interests in this property which are adverse, real and definite to the interests of Chevron. Chevron has done exactly this. The conflicting claims to the same rights in the same property are neither hypothetical nor academic. The court finds that the issues before the court are both definite and concrete and are brought by parties having adverse legal interests.

## III. THE VALIDITY OF THE JULY 3, 1978 LEASE

The central issue in this case is whether the lease granted by Lottie B. Smith to Robert W. Salsman, Jr. on July 3, 1978 is valid. In order to determine the validity of that lease, the court must look to the agreements which were entered into between the parties.

Under Article 1945 of the Louisiana Civil Code courts are bound to construe agreements between parties according to the true intent of all of the parties.[15] That

---

**14.** In this declaratory judgment action, the court must decide whether it is presented with an actual case or controversy within the meaning of Article III of the Constitution. 28 U.S.C. § 2201; *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945).

**15.** Article 1945 of the Louisiana Civil Code provides:

Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

*First*—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;

*Second*—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;

*Third*—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

intent is to be determined from the words of the agreements. Salsman contends that he was the lessee of Mrs. Smith and that his lease is valid and in full force and effect. Chevron contends that Salsman was only the agent of Mrs. Smith and that his power to act as her agent with respect to the property expired upon the death of Mrs. Smith.

Salsman and Mrs. Smith apparently signed an oil, gas and mineral lease on July 3, 1978 in which Mrs. Smith agreed to lease all of her undivided, unleased interest in the property described in the lease.[16] Salsman allegedly paid Mrs. Smith up front cash consideration in the amount of $231,-000 in return for the rights granted in the lease. However, on the same day, Salsman executed a counter letter which Mrs. Smith later accepted, in which the defendant set forth the true terms of the agreement which had been reached between Salsman and Mrs. Smith.[17] The counter letter recited the terms which had been agreed to by Salsman and Mrs. Smith in the lease executed that day. The counter letter provided in part that the "terms of the lease are as follows: $231,000.00 payment for a ten year Paid-Up Lease, with 35% royalty." The counter letter then described what "in truth and in fact" was the actual agreement between the parties. The actual agreement provided that there was to be "no initial cash payment made by the Lessee". The consideration for the lease and the counter letter was to be the "efforts and expenses" undertaken by Salsman in establishing the unleased nature of Mrs. Smith's interest and in securing the best possible trade for the lease. The counter letter further provided that Salsman was in fact the "agent" of Mrs. Smith and all actions taken by him would be for the sole benefit of "his principal". Salsman was to be paid ten percent of Mrs. Smith's interest in the lease or sale of the mineral interest. The agreement also provided that Mrs.

Smith should "bear the burden" of that previous contract for legal services entered into between Salsman and Andrew J.S. Jumonville under date of June 30, 1978.[18] The June 30, 1978 letter provided that legal services would be provided concerning the dispute with Chevron and that Jumonville would be paid a percentage of any amounts thereby recovered.

Article 2985 of the Louisiana Civil Code defines a mandate or agency as "an act by which one person gives power to another to transact for him and in his name, one or several affairs." Article 2988 provides that the "contract of mandate is completed only by the acceptance of the mandatary." Although Mrs. Smith and Salsman entered into a contract which they described as a lease, the court finds that the parties actually agreed to a contract of agency with Mrs. Smith as principal and Salsman as her agent. This conclusion is clearly supported by the agreements which Mrs. Smith and Salsman entered into. Salsman states that in truth and in fact he is the agent of Mrs. Smith and all of his actions shall be for the sole benefit of his principal. He also writes to some of Mrs. Smith's heirs explaining his agreement with her and states that he is in fact the agent of Mrs. Smith and will receive ten percent commission from the sale of the lease. Considering the evidence presented in this case, the court fails to see how any other conclusion could be reached in understanding the intentions of these parties from these agreements.

Salsman argues that if the court finds that he had an agency agreement with Mrs. Smith, then the court should also find that the agency was one coupled with an interest. Salsman maintains that because he had present rights in the property which was the subject of the agency, his agency was one coupled with an interest and irrev-

---

*Fourth*—That it is the common intent of the parties—that is, the intention of all—that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.

**16.** See footnote 2

**17.** See footnote 3

**18.** Chevron Exhibit 6

ocable, it did not expire upon the death of Mrs. Smith.

Chevron disputes the contention that Salsman had a present interest in the property. Chevron claims that no agreement between Salsman and Mrs. Smith ever granted Salsman any present rights in the property and, furthermore, Salsman never performed any of the obligations which would have allowed him to earn any interest in the property.

■ Article 3027 of the Louisiana Civil Code provides that the mandate expires upon the death of either the principal or the agent. The Louisiana jurisprudence has recognized an exception to the above stated rule when the agency is one coupled with an interest. If an agency agreement grants to the agent some present right or interest in the property which is the subject of the agency, then the agency does not expire upon the death of the principal. The agent maintains his right to deal with the property because he has been granted some personal right in the property.

In *Bown v. Holland*, 392 So.2d 726 (La. App. 3rd Cir.1980), the court was faced with a situation very similar to the facts in this case. In *Bown*, certain landowners hired a representative to secure recognition of a mineral interest in their property. Subsequently, the landowners tried to discharge him. The plaintiff brought suit claiming that he was the agent of the landowners with an interest in the property and that he could not be terminated because his agency was irrevocable. The court found that the agreement between the parties did not convey title to an interest in the property which the plaintiff could deal with in his own name. The court also found that plaintiff had not acquired any ownership interest in the property. Instead, the court found that the agreement simply obligated the defendants to effect a transfer to the plaintiff in the event that a mineral interest was recovered, confirmed or established. Thus, Bown's right to collect his fee was not absolute but was contingent upon his ability to accomplish the purpose of his agreement.

Similarly, in *Montgomery v. Foreman*, 410 So.2d 1160 (La.App. 3rd Cir.1982), the court defined what interest was necessary for a mandate to be irrevocable. The court held that a mere interest in the exercise of the power, instead of an interest in the property upon which the power is to operate, is insufficient under this test to constitute a power coupled with an interest.

■ Thus, in order for an agent to have an irrevocable power of attorney under Louisiana law, the agent must have a present enforceable interest in the property which is the subject of his mandate. In this case the court finds that Salsman had no such interest in the property in question. Salsman's agreement with Mrs. Smith provided that he would be paid ten percent commission from the sale of the lease. Commissions, contingency fees, or other such compensations to which a mandatary may be entitled if allowed to perform his duties are examples of a mere interest in the exercise of the power of mandate and are insufficient to render the mandate irrevocable. *Montgomery v. Foreman*, supra. Furthermore, Salsman never acquired any ownership interest in the property because he never accomplished the objectives of his mandate. Under the terms of the agreement, Salsman was to establish the unleased nature of Mrs. Smith's interest in the property covered by the lease and to secure the best possible trade for the lease. The evidence before the court clearly establishes that at no time before the death of Mrs. Smith did Salsman ever establish by judgment or otherwise that her interest in this property was not covered by the Chevron lease. Additionally, at no time did Salsman ever trade, sell, lease or otherwise convey any of Lottie B. Smith's interest in this property which was supposed to be unleased. On the contrary, the evidence at trial revealed that Salsman had negotiated with several oil companies as well as individual oilmen, but never finalized any deal concerning the property which is the subject of this lawsuit. Mere negotiations are insufficient to establish the objectives of the mandate under the facts of this case.

As a result, the court must and does conclude that the agency agreement between Salsman and Mrs. Smith terminated on March 3, 1981 when Mrs. Smith died.

Because the court has concluded that the agreement between Salsman and Mrs. Smith was an agency agreement which expired upon the death of Mrs. Smith, the court finds that it is unnecessary to reach the issue of what interest was actually covered by the Chevron lease. Since the heirs of Mrs. Smith ratified the agreements entered into between the heirs of Mrs. Smith and Chevron,[19] the court also finds that a determination of what interest was intended to be covered by the initial Chevron lease would serve no useful purpose at this time.

The court finds that the lease of July 3, 1978, recorded on the public records of Pointe Coupee Parish, Louisiana, and affecting the property previously described here is null and void. Therefore, the lease shall be cancelled from the public records of said parish.

Judgment shall be entered accordingly.

The plaintiff shall prepare a judgment in accordance with this opinion within ten days, which shall be approved as to form by the defendants herein.